**\*\*NOT FOR PUBLICATION\*\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

_____

JAMES NALEJ,

                      Plaintiff,

    v.

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

                      Defendant.

_____

Civil Action No. 16-3079 (FLW)(LHG)

**OPINION**

**WOLFSON, United States District Judge**:

      Before the Court is the Complaint of James Nalej ("Plaintiff") seeking review, pursuant

to 42 U.S.C. § 405(g) and § 1383(c)(3), of the determination of Defendant Nancy A. Berryhill,

the Acting Commissioner of Social Security ("Commissioner"), denying Plaintiff's application

for Disability Benefits under Title II and Title XVI of the Social Security Act on the grounds that

Plaintiff is not disabled because he retains the mental and physical residual functional capacity

("RFC") to perform other work available in the national economy. Plaintiff contends that the

Commissioner's decision is not supported by substantial evidence and asks the Court to reverse

the Commissioner's disability finding. For the reasons set forth below, the Court finds that the

Commissioner's decision is supported by substantial evidence and, therefore, affirms the

Commissioner's denial of Plaintiff's application for disability benefits.

I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

      Plaintiff was born on January 10, 1991, and was 21 years old at the time of his

application for disability benefits. Tr. 13, 35, 51, 253. Plaintiff is a high school graduate.  Tr. 50,

148. He attended one year of college. Tr. 35-36, 259. Plaintiff, has no past relevant work experience. Tr. 130, 143, 147-48.

On September 12, 2012, Plaintiff applied for Supplemental Security Income disability benefits, alleging disability due to a comprehensive genetic disorder, seizures, and congenital heart disease, beginning at birth, January 10, 1991. Tr. 130, 147. The application was denied initially and on reconsideration. Tr. 76-80, 83-90. Plaintiff requested a hearing before an administrative law judge to review the application *de novo*. *Id.* at Tr. 91-93. A hearing was held on November 18, 2014, before Administrative Law Judge Kimberly Schiro (the "ALJ"), at which Plaintiff, represented by counsel; Plaintiff's mother; and an impartial vocational expert testified. *Id.* at 30-56.

By Notice of Decision-Unfavorable, dated January 30, 2015, the ALJ denied Plaintiff's claims, finding that, despite medically determinable severe impairments including seizure disorder, migraine headaches, depression, and learning disability, Plaintiff nevertheless retained the physical capacity to perform sedentary work, provided that he not be exposed to workplace hazards or unprotected heights. Mentally, Plaintiff was limited to simple, routine tasks and occasional contact with co-workers and supervisors, but no direct, work-related contact with the public. He could not work in collaboration with others. He needed to avoid concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dust, gases, and poor ventilation. Tr. 10-25. Relying upon the testimony of the vocational expert ("VE"), the ALJ concluded that an individual with Plaintiff's impairments would be capable of performing work as an addresser (DOT 209.587-010), a document preparer (DOT 249.587018), and a final assembler (DOT 713.687-018).

Plaintiff appealed the ALJ's decision, and by Notice of Appeals Council Action dated March 21, 2017, the Appeals Council denied review, rendering the ALJ's January 30, 2015 opinion the final decision of the Commissioner. Tr. 4-7; *see* 20 C.F.R. § 404.981. Plaintiff filed the present action on May 27, 2016, seeking review of the Commissioner's denial of his application for disability benefits. Plaintiff's Complaint was filed outside the allotted period to seek review of the Commissioner's decision, but the Appeals Council subsequently granted Plaintiff's request for a one-day extension of time to file a civil action. Tr. 1-2. On appeal, Plaintiff contends that the Commissioner erred in (i) discounting Plaintiff's testimony regarding the frequency and intensity of his migraine headaches; (ii) finding that Plaintiff possessed the RFC to perform the basic mental demands of unskilled work; and (iii) crediting the unreliable testimony of the VE. In considering Plaintiff's appeal, the Court is therefore called upon to review the evidence in the administrative record underlying the ALJ's credibility and RFC determinations.

A. Review of the Objective Medical Evidence

1. Evidence of Physical Impairments

a. Treating Physicians

Plaintiff was treated in the Emergency Department of Jersey City Medical Center ("JCMC"), on July 27, 2004, for a ten-to-fifteen-minute, tonic-clonic seizure affecting his left side, which resulted in Plaintiff's temporary loss of consciousness. Tr. 170, 182, 199, 206. Plaintiff had not had a seizure before, but reported having headaches and dyspnea. Tr. 195. Plaintiff reported that, prior to experiencing the seizure, he had felt tired all the time, but had not passed out. *Id.* A CT scan revealed a low attenuation of the inferior left thalmus. Tr. 184. The radiologist was unable to formulate a medical diagnosis on the basis of the CT Scan alone and

recommended MRI imaging. *Ibid.* Plaintiff received an MRI at JCMC on July 29, 2004, which showed that there was possibility of an arteriovenous malformation around the Circle of Willis, including bilateral occlusion of the carotid arteries and significant collateral formation. Tr. 208. In other words, while the core, internal vessels that carry blood to the brain were malformed or absent, other, more peripheral vessels were overdeveloped to compensate. Dr. William C. Yu, M.D., reading Plaintiff's MRI, concluded that the abnormal development of blood vessels in Plaintiff's neck and brain might be attributable to moya-moya disease. Tr. 208. On July 30, 2004, a JCMC pediatric neurologist diagnosed Plaintiff with seizures and arteriovenous malformation. Tr. 202-03. Plaintiff had an echocardiogram on July 31, 2004, which reported normal heart function, except for trace insufficiency of the mitral and tricuspid valves, and an ejection fraction of 35%. Tr. 204, 219-20. On August 1, 2004, Plaintiff was discharged from JCMC and was prescribed Topamax 200 mg every twelve hours to control his seizures. Tr. 188-190. On September 14, 2004, Plaintiff obtained an angiogram at the University Hospital in Newark, New Jersey. Reading the results, neurologist Dr. Charles Prestigiacomo, diagnosed Plaintiff with a likely congenital absence of bilateral internal carotid arteries, with reconstitution of the intracranial circulation by means of anastomosis. Tr. 228-31. Again, it appeared that Plaintiff lacked the main internal arteries connecting the heart to the brain, but that more external blood vessels had over-developed to compensate.

Dr. Prestigiacomo examined Plaintiff on October 11, 2004. Tr. 226. Plaintiff's parents reported that he was doing well with no new complaints relating to his angiography. *Ibid.* They stated, however, that there had been a progressive deterioration in his behavior and school activity. *Ibid.* Dr. Prestigiacomo noted that there did not seem to be a strong suggestion of any anteriovenous fistula anomalies. *Id.* However, Plaintiff's intracranial circulation consisted of a

genesis of cervical carotid arteries and the intracranial carotid artery of the cavernous portion on the right side. Dr. Prestigiacomo explained that, as a result of these abnormalities, Plaintiff's "intracranial circulation is dependent on multiple external branches and anastomoses…" Tr. 226.

On January 3, 2005, Mr. Nalej was treated for seizures in the Emergency Room of Christ Hospital in Jersey City, New Jersey. Tr. 238-49. The Administrative Record contains no further treatment records for Plaintiff's physical conditions until after Plaintiff's September 12, 2012 disability application.

b. Consultative Physicians

On October 26, 2012, Plaintiff had a neurological evaluation with Maria E. Alexianu, Ph.D. Tr. 253-55. Plaintiff reported having been "sick all his life." Tr. 253. He reported taking Topamax, but not regularly. *Ibid.* He stated that Topamax seemed to prevent his seizures and helped with his complaints of dizziness. *Ibid.* Plaintiff's stepfather, who accompanied Plaintiff to the evaluation, reported that Plaintiff spent most of his time at home and seemed isolated and depressed. Tr. 253. Dr. Alexianu noted that Plaintiff was physically well-developed, well nourished, and very thin. Tr. 254. Dr. Alexianu noted that Plaintiff exhibited normal cognitive function, being awake, alert and oriented, with intact recent memory, attention, concentration, language function, and a normal fund of knowledge. Tr. 254. Plaintiff's motor function was within normal limits, and he exhibited a normal range of motion. *Ibid.* His strength was rated at 5/5 in both his upper and lower extremities. He had normal reflexes, cerebellar function, station, and gait, and could heel and toe walk normally. Tr. 255. Plaintiff did not provide Dr. Alexianu with any prior medical records, but, from consulting with Plaintiff, Plaintiff's mother, and step father, she assessed possible cerebral vascular formation, seizures, and depression. Tr. 253, 255.

Although Plaintiff's examination was normal overall, Dr. Alexianu referred Plaintiff for an MRI study of the brain, a neck MRA, blood tests, and EEG monitoring. Tr. 254-55. There is no indication in the record that Plaintiff ever had the follow up MRI, MRA, or EEG monitoring. He did undergo a blood test, the results of which are reflected in the record. Tr. 262-64.

Plaintiff had a consultative examination with Dr. Joseph Dilallo, M.D., on December 12, 2012. Tr. 268-71. Dr. Dilallo evaluated Plaintiff's complaints of a congenital disease involving comprehension, seizure history, congenital heart disease, and depression. Tr. 268. Of the first complaint, Dr. Dilallo observed that he was "not clear as to the exact nature of this alleged defect," observing that, although Plaintiff reported difficulties learning in school, he successfully graduated from high school and appeared quite articulate during the examination. Tr. 268. Dr. Dilallo concluded that it appeared that Plaintiff's biggest difficulties were with social issues and interpersonal relationships, with Plaintiff seeming shy and withdrawn. *Ibid.* Dr. Dilallo then noted that Plaintiff had not had a seizure episode for five years and that he took Topamax for therapy migraine headache prevention and/or seizure prevention. Tr. 268. He found that this treatment had been very effective, whichever its primary purpose. Tr. 268. Dr. Dilallo reported that Plaintiff's congenital heart problem appeared to have been resolved by heart surgery performed on Plaintiff as an infant, as neither Plaintiff nor his parents reported his having any chest pain or shortness of breath, and Plaintiff was not presently being treated for any cardiac condition. Tr. 268.

Dr. Dilallo reported that depression was a very important issue in claimant's behavior, including his staying in a dark room, sometimes for the entire day on weekends, sleeping excessively, and feeling isolated. 269. Dr. Dilallo observed that Plaintiff had low self-esteem. Plaintiff's parents also reported to the doctor that he was depressed, slept excessively, isolated

himself, and had poor self-esteem. Tr. 268. Plaintiff's physical examination was unremarkable and Dr. Dilallo described him as cooperative, pleasant, and intelligent. Tr. 270. The only conditions Dr. Dilallo found notable were facial acne, occasional headaches, and depression. Tr. 269. Dr. Dilallo further opined that Plaintiff had an excellent capacity for sitting, standing, lifting, carrying, bending, crouching, squatting, stooping, seeing, and hearing. Tr. 271. Dr. Dilallo also noted that Plaintiff's attention and concentration were intact, but Plaintiff's social interaction was poor, and he exhibited slow pace. Tr. 271. Additionally, Dr. Dilallo noted that it would be somewhat difficult for Plaintiff to adapt to changes and respond to work stress due to his depression, but he had a great potential for gainful employment. Tr. 271.

2. Evidence of Mental Impairments

a. Treating Physicians

From May 3 to July 26, 2013, Plaintiff received outpatient treatment at High Focus Centers for depressed mood, hopelessness, isolation, and anxiety. Tr. 300-01. Plaintiff was reported to be socially withdrawn. Tr. 300. He reported spending his days sitting in the dark, playing on his computer, and watching television. Tr. 300. On his initial mental status examination, Plaintiff had a flat affect, and a depressed mood, but his thought processes were logical and intact and he denied suicidal ideation, hallucinations, or paranoid thoughts. Tr. 300. He was treated for a major depressive disorder, recurrent and severe; as well as a social phobia; and was assigned a Global Assessment of Functioning ("GAF") score of 35. Tr. 300, 312, 318. He attended five hours of group therapy a day and weekly therapy, responded well to treatment, and showed steady improvement. Tr. 301. "Over the course of treatment [Plaintiff] exhibited significantly improved ability to utilize cognitive restructuring techniques, develop and maintain relationships with peers, and increased insight into the role of isolation in his decompensation."

*Ibid.* He was discharged from the program at the end of July 2013 with an estimated GAF of 50. Tr. 301. Plaintiff was recommended to continue with outpatient psychiatric treatment, but did not do so. Tr. 301.

    b. Consultative Physicians

       Plaintiff had a consultative examination with psychologist Ernesto L. Perdomo, Ph.D., on December 11, 2012. Tr. 265-67. Dr. Perdomo noted that Plaintiff had graduated from a special education program and was determined to have a learning disability, but could read well. Tr. 265-67. Dr. Perdomo also noted that Plaintiff had a history of migraine headaches and took Topamax daily. Tr. 265. Plaintiff also had a history of seizure disorder, but had not experienced a seizure for five years. Tr. 265. On examination, Plaintiff was well-oriented with organized and focused thought processes. Tr. 265. There was no indication of any formal thought disorder or psychosis. Tr. 265. Plaintiff's mood and affect were unremarkable, full, and appropriate. Tr. 265. Although Plaintiff stated that he was "okay," his stepfather, who was present for the evaluation, indicated that he was withdrawn and did not socialize or go out. Tr. 265. Plaintiff's full-scale IQ score was 84, using the Wechsler Adult Intelligence Scale, Fourth Edition — in the low average range of intelligence. Tr. 266. Dr. Perdomo also indicated some mild deficits in dealing with attention, concentration, mental control, and reasoning. Tr. 266. In summation, Dr. Perdomo opined that Plaintiff seemed to have an underlying personality disorder and complained of frequent, almost daily migraine headaches. *Id.* at 267. He concluded that Plaintiff's condition may affect his ability to function effectively. Tr. 267.

       On June 21, 2013, state agency psychologist Thomas Yared, M.D., opined after reviewing the consultative examination of Dr. Perdomo and the neurologic report from Dr.

Alexianu, that Plaintiff could understand, remember, and execute simple, routine instructions, and meet the basic mental demands of unskilled work. Tr. 73.

B. Review of the Testimonial Record & Plaintiff's Function Report

1. Plaintiff's Testimony

Plaintiff's case came before the ALJ for a hearing on November 18, 2014. At the hearing, Plaintiff, Plaintiff's mother, Elizabeth Jemidovich, and the vocational expert, Jackie Wilson, testified. Tr. 31. Plaintiff testified that he is single and lives with his mother and stepfather in Union, New Jersey. Tr. 35. He is supported by his parents. Tr. 36. He testified that he tried working at "Donuts," presumably Dunkin Donuts, and at a deli, but was unable to retain either position as he was told that he was "too slow" to keep up with the pace of work. Tr. 36. Plaintiff testified that he was struggling and could not work because he could not concentrate, suffered from memory loss, and had headaches. Tr. 36. He explained that he has migraine headaches once or twice a week lasting one to two hours, after which he will often lie down in his room. Tr. 37, 42. He testified that he takes Tylenol and Topamax to handle his headaches and ensure that he does not faint. Tr. 37. He also explained that he takes Topamax every day to prevent seizures. Tr. 37-38. He stated that his headaches were brought on by stress and "not enough oxygen." Tr. 38, 44. When asked by the ALJ for clarification about not getting enough oxygen, Plaintiff explained that he does not use any oxygen equipment and does not have difficulty breathing, but needs "fresh air." Tr. 38-39. Plaintiff reported that he usually took a pill and lay down in bed when he had headaches. Tr. 42. He testified that he took Topamax in the morning for the headaches, which made him "…a little sleepy, a little dopey, you know." Tr. 41, 46. Plaintiff testified that he spent his days watching movies and YouTube videos on his computer and doing household chores with his mother, including the laundry, and folding sheets.

Tr. 38, 157. He had his driver's license and occasionally drove his parents' cars. 39-40. He reported having no friends with whom he regularly got together. Tr. 39. Plaintiff explained that he was depressed because he could not go to work or to school like other people. Tr. 45. When he tried, he would get headaches and "lose oxygen." *Ibid.* He testified that he did not really leave the house because he felt antisocial and that no one wanted to socialize with him. Tr. 42-43. He became nervous around other people and testified that he felt "insignificant." Tr. 44.

Plaintiff explained that he no longer saw a psychiatrist but had been treated for depression at High Focus in the past. Tr. 40. Plaintiff stated that he "was suffering from depression" and "was . . . anti-social, which still kind of am." Tr. 40. The ALJ asked whether Plaintiff believed his symptoms were better after having attended the program at High Focus and inquired why Plaintiff was not seeing anyone else for his depression at present. Tr. 41. Plaintiff responded that High Focus had told him what to do when he was feeling depressed, including going outside and thinking happy thoughts. Tr. 41. He stated "I'm less depressed that way." Tr. 41.

2. Plaintiff's Function Report

In his Function Report, Plaintiff reported that he spent his time watching television and movies, playing on his computer, preparing simple meals, helping to do chores around the house, driving a car, shopping in stores for clothes, and "spend[ing] most of [his] time with [his] stepbrother."[1] Tr. 155-60. He reported no problems with personal care. Tr. 156. Plaintiff wrote that he could lift fifty pounds and walk 120 yards before needing to rest. Tr. 160. He reported no

---

[1] The Court notes the oddity of Plaintiff's claim to spend most of his time with his stepbrother, who is not mentioned elsewhere in the record. The fact that Plaintiff regularly socializes with someone other than his parents conflicts with Plaintiff's testimony concerning his isolation, and further supports a finding that his social limitations were less severe than subjectively claimed.

problems with paying attention, noting that he "pay[s] attention all the time," and usually can follow written instructions after reviewing them for two to four minutes, depending upon what the instructions are. Tr. 160. Plaintiff also reported getting along well with authority figures. Tr. 161.

### 3. Plaintiff's Mother's Testimony

Plaintiff's mother testified that Plaintiff would not leave the house alone and that he spent most of the day in his room alone for as much as twenty-four hours at a time. Tr. 49. She confirmed that he did not have any friends. She also testified that Topamax made him "very slow," but that, when he was using it, he mostly would not have a headache and would be able to sleep. Tr. 50. She testified that Plaintiff is very talented in art, and formerly walked to the local college for class part-time, but that Plaintiff's forgetfulness prevented him from completing his education. Tr. 50. She explained that because of his condition having been born without the main arteries to the brain, he relied on three other vessels and was not able to get enough oxygen. Tr. 52. She testified that because heat aggravated Plaintiff's condition, in the summertime he had to remain in his room with the air-conditioning on in order to avoid fainting. Tr. 52.

### C. The ALJ's Findings

On January 30, 2015, the ALJ found that Plaintiff was not disabled from September 12, 2012, the application date, through the date of the ALJ's decision. Tr. 13-22. At step one of the Commissioner's five-step sequential evaluation process, the ALJ determined that Plaintiff was not performing substantial gainful activity. Tr. 15. At step two, the ALJ found that Plaintiff's history of seizure disorder, migraine headaches, depression, and history of learning disorder are severe impairments. Tr. 15. At step three, however, the ALJ determined that Plaintiff's impairments are not of listing-level severity. Tr. 15-16. The ALJ then found that Plaintiff retains

the RFC to perform a range of sedentary work, provided that he is unable to climb ladders, ropes or scaffolds, and cannot work in the presence of workplace hazards, or have concentrated exposure to temperature extremes, wetness, humidity, fumes, odors, dusts, gases, or poor ventilation. Tr. 17. Additionally, the ALJ found that Plaintiff can perform simple routine tasks, make simple work-related decisions, adapt to occasional changes in essential work tasks, have occasional contact with coworkers and supervisors, but cannot have direct work-related contact with the public. Tr. 17. Finally, the ALJ found that Plaintiff can work around others, but not on teams or in collaboration with others. Tr. 17. At step four, the ALJ found that Plaintiff had no past relevant work. Tr. 21. At step five, relying on the VE's testimony, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, such as addresser, document preparer, and final assembler. Tr. 21-22. Accordingly, the ALJ found Plaintiff not disabled from his 2012 application date through the date of the ALJ's decision. Tr. 22.

## III. STANDARD OF REVIEW

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record." 42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d

772, 776 (3d Cir. 1978), the standard is highly deferential. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "It means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999). A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993). Accordingly, even if there is contrary evidence in the record that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id.* at § 1382c (a)(3)(A)–(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether

the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id.* at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146–47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146–47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). These activities include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id.* A claimant who does not have a severe impairment is not considered disabled. *Id.* at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id.* at § 404.1520(d); *see also Bowen*, 482 U.S. at 146–47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id.* An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the "residual functional capacity" ("RFC") to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant is able to perform previous work, the claimant is determined not to be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141–42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428.

Fifth and finally, if it is determined that the claimant is no longer able to perform his or her previous work, the burden of production shifts to the Commissioner to show, at step five, that the "claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146–47 n.5; *Plummer*, 186 F.3d at 428. This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience. 20 C.F.R. § 404.1520(f). The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant is capable of performing work and not disabled. *Id.*

If the reviewing court finds that the ALJ has erred in the sequential evaluation process, it may modify or reverse the ALJ's decision, with or without remanding the case for rehearing. 42 U.S.C. § 405(g). Reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221-222; *Morales v. Apfel*, 225 F.3d 310,320 (3d Cir. 2000). Remand is proper if the record is incomplete, if there is a lack of substantial evidence to support a definitive finding on one or more steps of sequential evaluation process, or if the ALJ's decision lacks adequate reasoning in support of its conclusions to permit for meaningful review by the district court. *See Podedworny*, 745 F.2d at 221-22; *Burnett v. Comm'r of Soc. Sec.*, 220

F.3d 112, 119-20 (3d Cir. 2000). *See also Adorno v. Shalala*, 40 F.3d 43,48 (3d Cir. 1994) (remand appropriate where the ALJ's findings are not the product of a review which "explicitly weigh[s] all relevant, probative and available evidence" in the record (internal quotation marks omitted)).

IV. ANALYSIS

    A.  Discounting Plaintiff's Testimony Regarding the Frequency and Intensity of Migraine Headaches

Plaintiff first contends that the ALJ erred in disregarding Plaintiff's subjective complaints concerning the frequency and intensity of his migraine headaches, which, Plaintiff argues, were the result of a medical condition evidenced in the record. It is true that, when objective medical evidence corroborates a claimant's subjective complaints, the claimant's testimony is entitled to "great weight." *Schaudeck v. Commissioner of SSA*, 181 F.3d 429, 433 (3rd Cir. 1999) ("An ALJ must give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence")(citing *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979)). In support of his appeal, Plaintiff notes that the record reflects a malformation of the arteries in his brain, diagnosed as moya-moya disease, which results in poor circulation of blood to his brain. Tr. 208. Plaintiff further testified that he experienced migraine headaches once or twice a week, lasting one to two hours, after which he would often lie down. Tr. 37, 42. Plaintiff took Topamax in the morning every day as a prophylactic for seizures and headaches. Tr. 38. He testified that the Topamax made him a little sleepy and a little dopey. Tr. 41, 50. Plaintiff contends that the medical evidence of an arteriovenous malformation and moya-moya disease establishes a medically determinable condition that could be causing Plaintiff's migraine headaches and that there is no basis to reject

Plaintiff's testimony regarding the nature, severity, duration, and frequency of his migraine headaches in light of this evidence. Plaintiff argues that full consideration of his testimony should have resulted in a finding that he is disabled because the VE agreed that if an individual had to take an unscheduled break for one hour at a time, there would be no jobs available to such an individual, Tr. 55, and Plaintiff testified of his need to rest after suffering headaches, Tr. 42.

Administrative law judges are obliged to provide specific and articulable reasons when discounting a plaintiff's subjective complaints. *See* 20 C.F.R. § 404.1529, as clarified in Social Security Ruling 96–7p.

> Social Security Ruling 96–7p states that the ALJ may not reject a claimant's testimony with merely "a single conclusory statement" or a bare recitation of "the factors that are described in the Regulations for evaluating symptoms." SSR 96–7p. Rather, the decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." *Id.*

*Harkins v. Comm'r of Soc. Sec.*, 399 F. App'x 731, 735 (3d Cir. 2010) (quoting SSR 96-7p). Credibility assessments involve a two-step process. First, Plaintiff must provide medical evidence showing a medical impairment that could reasonably be expected to produce the alleged symptoms. 20 C.F.R. § 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent they limit Plaintiff's ability to do basic work activities. 20 C.F.R. § 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms…"). Other relevant information includes what may precipitate or aggravate the symptoms, medications and treatments, and daily living activities. 20 C.F.R. § 416.929(c)(3).

Here, the ALJ provided specific reasons in support of his determination that Plaintiff's subjective complaints concerning the limitations imposed by his migraine headaches were not entirely credible. Specifically, the ALJ made a determination that Plaintiff's medically determinable impairments, including migraine headaches, could reasonably be expected to cause his alleged symptoms, but found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. Tr. 18. Credibility determinations are entitled to substantial deference on appeal. *See Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003) (stating that courts "ordinarily defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess a witness's demeanor."); *see also Izzo v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 280, 286 (3d Cir. 2006) (finding that "a reviewing court typically defers to an ALJ's credibility determination so long as there is a sufficient basis for the ALJ's decision to discredit a witness.").

Reviewing the ALJ's decision, it appears that at least three major factors affected his credibility determination. First, the ALJ considered the evidence in the record suggesting that Plaintiff's migraines were well-controlled with medication. The ALJ explicitly observed that "rest and medications alleviate [Plaintiff's] symptoms." Tr. 17. Substantial evidence in the record supports this conclusion, including Dr. Dilallo's opinion that Plaintiff's history of seizures and suffering from migraine headaches appeared to be effectively treated by Plaintiff's taking Topamax, Tr. 268; Plaintiff's testimony that taking Topamax and Tylenol prevented him from fainting and took away the pain of his migraine headaches, *id.* at 37-38; Plaintiff's testimony that his migraine headaches felt "just like a normal headache" and could be made to "go away" by "just . . . tak[ing] a pill[,]" Tr. 42; and Plaintiff's mother's testimony that, as long as Plaintiff takes his pills, he mostly has no headaches, Tr. 50.

Second, the ALJ noted that there was no evidence of Plaintiff having sought specialized or emergency treatment for his headaches, nor evidence of any diagnostic evaluations or treatment whatsoever for any condition between Plaintiff's January 2005 emergency hospitalization for a seizure and October 2012, when Plaintiff was evaluated by a neurologist in connection with his application for disability benefits. Tr. 18. That neurological examination was substantially normal, and, although the neurologist recommended an MRI to follow up on possible cerebral vascular malformation, Plaintiff never obtained one. Tr. 19, 254-55. Social Security regulations provide that, before failure to seek treatment may be considered as evidence against a finding of disability, the ALJ must first consider any explanations the Plaintiff offers for the failure.

> SSR 96–7p . . . states that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment."

*Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2003) (quoting SSR 96–7p, 1996 SSR LEXIS 4, at *22). The most common circumstance in which a plaintiff's failure to seek treatment is not considered indicative of the absence of disability is where the plaintiff cannot afford to pay for treatment. *See, e.g.*, *Newell*, 347 F.3d at 547.

Here, Plaintiff has failed to provide any explanation for his failure to seek treatment for his migraine headaches that would prevent the Court from drawing an inference that they were not disabling. Moreover, the Court finds no such explanation in the record. On the contrary, as the ALJ observed, the evidence in the record suggests that his migraines were controlled through rest and over-the-counter medication. Plaintiff's failure to seek treatment for his migraines also contrasts with his history of seeking treatment for his seizures, and, after his disability

application, for depression. Tr. 170, 182, 199, 206, 300-01. Taken together, these factors demonstrate that Plaintiff's failure to seek treatment supports a finding that Plaintiff's migraine headaches were not as disabling as represented in Plaintiff's subjective complaints. *Perez v. Comm'r of Soc. Sec.,* 521 F. App'x 51, 55 n.2 (3d Cir. 2013) (drawing negative inference from failure to seek treatment where plaintiff "provides no explanation for failing to seek treatment during the relevant time period, and no other information in the record suggests a reason for irregular medical visits . . . [but,] [t]o the contrary, the record suggests that [plaintiff] has regularly sought medical treatment . . . when she has needed it."); *Kelley v. Barnhart*, 138 F. App'x 505, 50 n.2 (3d Cir. 2005) (drawing negative inference where plaintiff "offers no explanation as to why she refrained from seeking regular medical treatment for the period in question.").

Third and finally, the ALJ took note of the substantial evidence in the record demonstrating Plaintiff's lack of limitations, including the testimony concerning his performance of household chores, driving, and use of the computer to search the internet, Tr. 38-40, 155-60; and the reports of the consultative examiner, who opined that Plaintiff had an excellent capacity for sitting, standing, lifting, carrying, bending, crouching, squatting, stooping, seeing, hearing; adequate concentration; and great potential for gainful employment, Tr. 20, 271.

Accordingly, the Court finds that the ALJ did as required under SSR 96–7p and explained that Plaintiff's testimony was not entirely credible because it conflicted with other medical and testimonial evidence in the record. *See Harkins*, 399 F. App'x at 735-36 ("The ALJ did as required under SSR 96–7p, explaining that he found [plaintiff's] testimony not credible because it conflicted with the medical evidence and with the evidence of [plaintiff's] ability to perform daily tasks. . . . Consequently, we find that the ALJ gave proper consideration to

[plaintiff's] subjective complaints . . . and that the ALJ's conclusion was supported by substantial evidence in the administrative record."). This Court finds no basis in the record to overturn the ALJ's credibility determination and finds that the ALJ's partial discounting of Plaintiff's subjective complaints of migraine headache symptoms was supported by substantial evidence.

B. Plaintiff's Mental RFC to Perform Unskilled Work

Plaintiff next contends that the ALJ erred in finding that Plaintiff possessed the requisite mental RFC to perform the basic requirements of unskilled work. Plaintiff argues that the evidence in the record of Plaintiff's very slow pace, poor capacity for social interaction, and difficulty in adapting to changes supports the conclusion that Plaintiff has experienced a substantial loss in the ability to meet the basic mental demands of unskilled work under SSR 85-15 and POMS § DI 25020.10. SSR 85-15 provides that the basic demands of unskilled work include the ability to "understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations, and to deal with changes in a routine work setting. A substantial loss of ability to meet any of these basic-work related activities would severely limit the potential occupation base." *Ibid.* POMS § DI 25020.10 similarly provides that a claimant would be found disabled where he experiences a "substantial loss" in the ability to meet the following basic mental demands of unskilled work: understand, carry out, and remember simple instructions; make judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions; respond appropriately to supervision, coworkers and work situations; and deal with changes in a routine work setting. *Ibid.* POMS § DI 25020.10 further expands upon the requisite mental functions "critical for performing any unskilled work[,]" including the capacity to "complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a

consistent pace without an unreasonable number and length of rest periods . . .[;] get along with coworkers or peers without . . . distracting them or exhibiting behavioral extremes[;] [and] respond appropriately to changes in a (routine) work setting." Identifying evidence in the record, Plaintiff contends that he cannot meet these demands. Plaintiff cites Dr. Dilallo's conclusions, after his December 12, 2012 examination of Plaintiff, that Plaintiff suffered from very poor social interest and interaction, very slow pace, and moderately severe depression, and would find changes in and responding to work stress somewhat difficult due to his depression. Tr. 271. Plaintiff notes that the ALJ assigned these findings "great weight." Tr. 20. Plaintiff also draws the Court's attention to the December 11, 2012 report of the consultative psychologist, Dr. Perdomo, in which he found Plaintiff to have "some mild deficit within the low average to upper borderline range" in attention, concentration, mental control, and reasoning. Tr. 266. Finally, Plaintiff points to the July 2013 treatment records in which High Focus Centers' treating psychiatrist determined Plaintiff to have severe depression, with a corresponding GAF score of 35. Tr. 300, 312, 318. Plaintiff argues that this evidence demonstrates that Plaintiff suffered "substantial loss" in his ability to perform the demands of unskilled work.

The ALJ is responsible for making the ultimate determination of an individual's RFC. 20 C.F.R. § 404.1546; *see Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."). "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, he must "give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see also Fargnoli v. Halter*, 247 F.3d 34, 43 (3d. Cir. 2001) (an ALJ is required to provide "an explanation of the

reasoning behind [his] conclusions," including "reason(s) for discounting rejected evidence.");

*Cotter*, 642 F.2d at 704. "In the absence of such an indication, the reviewing court cannot tell if

significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. For

example, in *Burnett*, the Third Circuit determined that remand was warranted, because the ALJ

"fail[ed] to consider and explain his reasons for discounting all of the pertinent evidence before

him in making his residual functional capacity determination." 220 F.3d at 121. However,

"[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are

bound by those findings, even if [the courts] would have decided the factual inquiry differently."

*Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3rd Cir. 2012) (internal quotation marks and

citation omitted).

Here, although Plaintiff has identified some evidence of Plaintiff's depression and

limitations in pace and social interaction that could enable a court to resolve the RFC factual

inquiry differently, this does not satisfy Plaintiff's burden on appeal, and the record clearly

reflects substantial evidence in support of the ALJ's RFC finding limiting Plaintiff to simple

routine tasks; simple work-related decisions; occasional changes in essential work tasks;

occasional contact with co-workers and supervisors, but no direct work-related contact with the

public; and work around others, but not on teams or in collaboration with others. Tr. 17-21.

Firstly, the ALJ noted that Plaintiff received outpatient treatment for depression between May

2013 and July 2013, but did not pursue any further psychiatric treatment thereafter. Tr. 19, 300-

01. As discussed in the context of Plaintiff's migraine headaches above, Plaintiff's failure to seek

psychiatric treatment for his depression after his treatment at High Focus supports the ALJ's

finding that Plaintiff's mental impairment symptoms were somewhat alleviated after July 2013

and by the time of the November 2014 hearing. Mindful of SSR 96-7p, the ALJ actually directly

asked Plaintiff why he did not continue to go to any medical providers for treatment of his alleged psychiatric conditions. Tr. 41 ("why don't you go to anybody else right now?"). Plaintiff responded that he did not seek treatment because he employed the methods he learned at High Focus and was less depressed as a result. Tr. 41 ("I talked about my problems, and they [High Focus] told me what to do . . . I'm less depressed that way.").

Citing a number of non-binding, out-of-circuit cases, Plaintiff suggests that his failure to seek continuing psychiatric treatment should not be construed as evidence that his depression was not disabling because, while he should have sought treatment, his failure to do so was merely the result of poor judgment, not the absence of symptoms. *See Regennitter v. Comm'r Soc. Sec. Admin.*, 166 F.3d 1294, 1299-1300 (9th Cir. 1999) ("[W]e have particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is notoriously underreported and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'") (quoting *Van Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (fact that a "claimant may be one of the millions of people who did not seek treatment for a mental disorder until late in the day" is not a substantial basis to reject that an impairment existed)); *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004) (quoting Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th Cir. 1989) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation")). These cases are not persuasive because Plaintiff's testimony demonstrates his understanding of the value of treatment as well as its beneficial effect on his quality of life, Tr. 41, and because the medical record demonstrates Plaintiff's willingness to seek treatment when required, Tr. 300-01. *Perez*, 521 F. App'x at 55 n.2. Nothing suggests that Plaintiff's mental impairments prevented Plaintiff from seeking treatment or affected his

judgment, or, for that matter, that of his parents, upon whom Plaintiff is dependent and who the record demonstrates were actively involved in Plaintiff's medical care.

Secondly, in addition to the absence of further treatment, the ALJ observed that Plaintiff's consultative examinations took place in December 2012, prior to when Plaintiff initially sought psychiatric treatment. The ALJ thus gave particular weight to Plaintiff's treatment records from High Focus and Plaintiff's testimony at the administrative hearing, which showed that by July 2013, Plaintiff's depressive condition had significantly improved. Tr. 20, 41, 301 (Plaintiff "responded well to treatment . . . demonstrated good insight into his illness . . . [and] exhibited significantly improved ability" to use techniques to manage it). Plaintiff's treating psychiatrist at High Focus further opined that Plaintiff exhibited significantly improved ability to develop and maintain relationships with peers. Tr. 301. Moreover, at the hearing in November 2014, Plaintiff testified that he was successfully employing the techniques he had learned from High Focus and felt less depressed as a result. Tr. 20, 40-41.[2]  That Plaintiff's

---

[2] In the present motion, Plaintiff argues that this evidence is contradicted by other sections of Plaintiff's testimony tending to show that he remained depressed. *See, e.g.*, Tr. 38 (Plaintiff had no friends); 42 (Plaintiff mostly did not leave the house); 44 (Plaintiff sometimes felt "insignificant"). Again, Plaintiff misapprehends his burden on appeal. In her opinion, the ALJ identified substantial evidence supporting her conclusion that Plaintiff's depression had lessened after Plaintiff's July 2013 completion of treatment. The presence of contradictory evidence alone is insufficient for this Court to reverse the ALJ's well-supported finding. *Hagans*, 694 F.3d at 292 ("[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently."). Thus, this Court agrees with the ALJ that it appeared that Plaintiff's depression did not meet the 12 month durational requirement of 42 U.S.C. § 423(d)(1)(A) because, beginning with Plaintiff's first diagnosis of depression during his consultative examination in October 2012 with Dr. Alexianu, he was significantly better by July 2013, less than 12 months later. Tr. 20. Even if Plaintiff's depression had met the 12 month durational requirement, additional evidence cited by the ALJ suggested that Plaintiff's depression had lessened by the November 2014 hearing. In either event, the ALJ appropriately limited Plaintiff, on the basis of the claimed mental impairments, not only to unskilled work, but also to work that only required occasional changes in essential work tasks, occasional contact with co-workers and supervisors, no direct work contact with the public, and no team work. Tr. 17.

depression and other mental limitations were not disabling was further supported by the June 2013 report of the state agency psychologist, Dr. Yared, who, as an expert in disability evaluation, opined that Plaintiff could meet the basic mental demands of unskilled work after reviewing Plaintiff's medical records. Tr. 73. Collectively, this evidence substantially supports the ALJ's conclusion that Plaintiff could perform a range of sedentary work that was simple, routine, with simple work-related decisions, occasional changes in essential work tasks, and only occasional interpersonal interactions. Tr. 17.

C. Reliability of the VE's Testimony

Third and finally, Plaintiff contends that the ALJ erred in basing his disability determination on the allegedly unreliable testimony of the VE. Specifically, Plaintiff argues that, counter the testimony of the VE, he cannot perform the jobs of addresser or document preparer because (1) the job of addresser does not exist in substantial numbers, as acknowledged by the SSA in a 2011 Occupational and Medical Vocational Claims Review Study (noting that the job of addresser likely does not exist in significant numbers but is cited by vocational experts in as many as 9% of SSA cases); and (2) the job of document preparer requires a higher general educational development reasoning level than contemplated by unskilled work, Tr. 53. Specifically, Within the Dictionary of Occupation Titles ("DOT"), each listed occupation has a General Educational Development ("GED") level, which, in turn, has three elements: Reasoning, Math, and Language. DOT, App. C. Each DOT occupation has a GED level between 1 and 6. *Ibid.* Appendix C of the DOT defines Reasoning Level 3 as possessing the ability to "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form . . . [and] [d]eal with problems involving several concrete variables in or from standardized

situations." Plaintiff argues that Plaintiff's limitations evidenced in the record clearly place him at a Reasoning Level below 3.

As a threshold matter, Plaintiff's motion does not specifically challenge the third job identified by the VE (final assembler, DOT # 713.687-018), other than to re-raise his previous argument that Plaintiff's migraines would preclude him from engaging in substantial gainful activity, Pl.'s Br. at 21. The Court has already found, *supra*, that the ALJ's RFC determination was supported by substantial evidence and included functional limitations tailored to Plaintiff's RFC. Accordingly, Plaintiff brings no independent challenge to the VE's testimony concerning the job of final assembler.

SSA regulations provide that work exists in the national economy when there is a significant number of jobs in *one or more* occupations that an individual can perform. 20 C.F.R. § 416.966(b). Thus, at step five, a plaintiff is not disabled if he can perform work that exists in significant numbers in *one or more* occupations in either the region where he lives or in several regions of the country. *See* 42 U.S.C. § 423(d)(2)(A); *Rutherford v. Barnhart*, 399 F.3d 546, 558 (3d Cir. 2005) ("As for the other instances of claimed inconsistency, which relate to two jobs identified by the expert with specified vocational preparation classifications that render them beyond the ALJ's limitation to unskilled work, they are simply not egregious enough—either in number or in substance—to bring into question the ALJ's reliance on the expert testimony as a whole. Therefore, although some minor inconsistencies may exist between the vocational testimony and DOT information, we conclude that the testimony provided substantial evidence for the ALJ's conclusions."); *Wright v. Sullivan*, 900 F.2d 675, 679 (3d Cir. 1990) (holding that the Commissioner meets her burden when she identifies at least one occupation in the national economy that the plaintiff can perform); *Dickerson v. Colvin*, No. 12-CV-05585, 2014 WL

562981, at *10 (D.N.J. Feb. 11, 2014) *appeal dismissed* (May 12, 2014) ("it is sufficient for the ALJ to identify at least one job that exists in significant numbers.").  Therefore, even if Plaintiff's arguments regarding the addresser and document preparer jobs were meritorious, because Plaintiff does not present a viable challenge to the final assembler job, and Plaintiff did not object to the VE's qualifications, the ALJ was entitled to rely upon the VE's testimony, and substantial evidence in the record supports the ALJ's finding that Plaintiff can perform work that exists in significant numbers in at least one occupation in either the region in which he lives or in several regions of the country. Plaintiff's step five argument is therefore without merit, and the record supports the Commissioner's finding that Plaintiff is not disabled. Tr. 54; *see* 42 U.S.C. § 423(d)(2)(A).

Although the ALJ's reliance on the existence of the occupation of final assembler is a sufficient basis for affirmance, the Court also notes, in the alternative, that Plaintiff's challenges to the VE's testimony concerning the occupations of addresser and document preparer also fail. With respect to the job of addresser, SSA regulations allow the ALJ to rely on the VE's testimony regarding the number of jobs available in the national economy. DOT 209.587-010; 20 C.F.R. § 416.966(d).  The 2011 Occupational and Medical Vocational Claims Review Study cited by Plaintiff does not have the force of law, and Plaintiff has pointed to no authority suggesting that it may be used to contradict express regulations.  Here, the VE testified that there are 25,201 addresser jobs in the economy, and Plaintiff stipulated to the VE's qualifications. Tr. 21, 53-54.  Therefore, Plaintiff's argument that the job of addresser does not exist in significant numbers is not based on law or evidence in the record.

Stated differently, Plaintiff's argument is that the VE was factually incorrect in her opinion on the number of addresser positions available in the national economy. The law does

not permit Plaintiff to raise such an argument for the first time on appeal. *Matthews v. Apfel*, 239 F.3d at 593 ("when the claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ"). At the hearing, Plaintiff failed to cross-examine the VE on the alleged inaccuracy of her addresser opinion or on the import of the 2011 Occupational and Medical Vocational Claims Review Study. Tr. 55. Because the Review Study has been available since 2011, and Plaintiff makes no showing of good cause as to why it was not previously presented to the ALJ, Plaintiff's challenge based on it is not a basis for reversal or remand in the Third Circuit.[3]

With respect to the job of document preparer, Plaintiff is mistaken in arguing that the occupations GED reasoning level of 3 necessarily places it outside the capabilities of an individual, like Plaintiff, limited to simple, routine, unskilled work. "[T]here is no bright-line rule stating whether there is a per se conflict between a job that requires level 3 reasoning and a finding that a claimant should be limited to simple and routine work." *Zirnsak v. Colvin*, 777 F.3d 607, 618 (3d Cir. 2014). In *Zirnsak*, the Third Circuit considered a combination of factors that compelled its finding that "any conflict [was] not so obvious that the ALJ should have pursued the question." *Id.* at 619. Among them, the court considered evidence in the record

---

[3] More generally, Plaintiff's factual attack on the VE's addresser opinion based on materials not brought to the VE's and ALJ's attention at the hearing does not conform to any of the recognized appellate challenges to an ALJ's reliance on VE testimony. *See Rutherford*, 399 F.3d at 554 n.8 ("a claimant can frame a challenge to an ALJ's reliance on vocational expert testimony at step 5 in one of two ways: (1) that the testimony cannot be relied upon because the ALJ failed to convey limitations to the vocational expert that were properly identified in the RFC assessment, or (2) that the testimony cannot be relied upon because the ALJ failed to recognize credibly established limitations during the RFC assessment and so did not convey those limitations to the vocational expert. Challenges of the latter variety . . . are really best understood as challenges to the RFC assessment itself.").

establishing that the claimant could actually perform the jobs in question; objective medical evidence unsupportive of the claimant's allegations of disabling mental impairments; and counsel's failure at the hearing to identify any inconsistencies between the VE's testimony and the DOT. *Id.* at 617-19. Two of the three factors are present here. The objective medical record does not support the existence of a disabling impairment, as discussed above and in the ALJ's decision, Tr. 17-21. And Plaintiff's counsel did not identify inconsistencies at the hearing between the reasoning level posed to the VE prior to her identifying the occupation of document preparer and the reasoning level for document preparer listed in the DOT. Tr. 55-56. Under these facts, and in light of the unambiguous holding in *Zirnsak*, there is no *per se* conflict between the VE's identification of a job that requires Reasoning Level 3, and Plaintiff's limitation to simple, routine, unskilled work so obvious that the ALJ should have pursued the question further. *Zirnsak*, 777 F.3d at 617-19. The ALJ's reliance upon the VE's testimony was thus not improper.

IV. CONCLUSION

For the foregoing reasons, having rejected all three of Plaintiff's arguments on appeal and having found that the ALJ's opinion is supported by substantial evidence in the administrative record, the Court affirms the decision of the Commissioner denying Plaintiff's application for SSI disability benefits. An appropriate Order to follow.


Dated: _____12/19/2017_____ _____/s/ Freda L. Wolfson_____
                                                                    The Honorable Freda L. Wolfson
                                                                    United States District Judge